UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 4:17-cv-00186-RLY-DML |
| WILDLIFE IN NEED AND WILDLIFE IN DEED, INC., TIMOTHY L. STARK, MELISA D. STARK, and JEFFREY L. LOWE, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| MELISA D. STARK, TIMOTHY L. STARK, and WILDLIFE IN NEED AND WILDLIFE IN DEED, INC., | ) ) ) ) ) | |
| Counter Claimants, | ) ) | |
| v. | ) ) | |
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., | ) ) ) | |
| Counter Defendants. | ) | |

**ENTRY ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Faced with mounting evidence that economic growth and development were threatening various species of fish, wildlife, and plants, Congress passed the Endangered Species Act of 1973 (the "ESA" or "Act"), 16 U.S.C. § 1531 *et seq.*, to protect endangered and threatened species. Section 9 of the Act makes it unlawful for any

1

person to "take" a protected species.  "Take" includes any conduct that harasses, harms, or wounds the species.

This case asks whether certain animal exhibitors have "taken" various species of lions, tigers, and hybrids (collectively "Big Cats") by declawing them and prematurely separating them from their mothers to use in hands-on, public interactions called "Tiger Baby Playtime".  On this record, the court has little difficulty concluding such conduct constitutes a "taking" and thus violates the ESA.

## I.    Background

People for the Ethical Treatment of Animals, Inc. ("PETA") filed this lawsuit against Timothy Stark, Melissa Lane[1], and their nonprofit zoo in Charlestown, Indiana, Wildlife in Need and Wildlife in Deed, Inc. ("WIN") (all collectively the "WIN Defendants").  PETA alleges the WIN Defendants have harmed, harassed, and wounded Big Cats in their possession in violation of the ESA.  PETA seeks a permanent injunction and an order authorizing the transfer of the Big Cats off WIN's property.  The WIN Defendants contend summary judgment is inappropriate.  Additionally, Stark individually seeks partial summary judgment in his favor.  The facts are undisputed unless otherwise noted.

---

[1] Lane and Stark were married at the time this litigation commenced.  The two have since divorced, and Melissa has changed her name from Melissa Stark to Melissa Lane. (Filing No. 349, the WIN Defendants' Response Brief at 1 n. 2).

A.    **Wildlife in Need and Big Cats**

WIN is a zoo located in Charlestown, Indiana that houses exotic and endangered animals, including Big Cats. (Filing No. 1, Complaint ¶ 13; Filing No. 23, Answer ¶ 1). Stark and Lane formed WIN in 1999. (Filing No. 317-1, PETA's First Evidentiary Submission ("PETA's First Submission") at 30, Deposition of Melissa Lane ("Lane Dep.") at 61:19 – 20). Stark is the President of WIN. (PETA's First Submission at 3, Deposition of Tim Stark ("Stark Dep.") at 44:1 – 2). He oversees the day-to-day operations, manages the animal care, and oversees volunteers who assist with animals. (Complaint ¶ 14; Answer ¶ 1). Lane was the secretary and treasurer for WIN and helped Stark with day-to-day operations up until October of 2019.[2] (Complaint ¶ 15; Answer ¶ 1).

WIN exhibits Big Cats to the public through hands-on encounters called "Tiger Baby Playtime". (Filing No. 46-1, Transcript of the TRO Hearing on October 19, 2017 ("TRO Tr.") at 6:6 – 10; 52:6 – 7). During Tiger Baby Playtime, WIN invites members of the public to interact, play, and feed Big Cat Cubs in exchange for a twenty-five-dollar donation. (Filing No. 57-8, United States Department of Agriculture ("USDA") Inspection Report, September 8, 2014 at 1). Stark leads Tiger Baby Playtime with the help of WIN volunteers. (*Id.*). During these sessions, Stark will give a brief introduction and then carry Big Cat Cubs to the room where anywhere from thirty to fifty members of the public greet the Cubs. (Filing No. 57-7, USDA Inspection Report, September 14,

---

[2] The WIN Defendants represent that Lane has not worked at WIN since 2019.

2015 at 1).  There are no barriers between the Big Cat Cubs and attendees: the Cubs roam freely, and attendees can pet, touch, and pick them up.  (*Id.*).  The Cubs' ages range anywhere from six weeks to sixteen weeks.  (PETA's First Submission at 9 – 10, Stark Dep. at 134:23 – 135:1).

Stark routinely declaws Big Cat cubs in his possession.  (TRO Tr. at 35:2 – 6; 93:18 – 23; PETA First Submission at 17, Stark Dep. 156:15 – 20).  He declaws them so that he can handle them easier—not out of medical necessity.  (TRO Tr. 84:23 – 25; 86:10 – 13).  Though the number of actual declawed cubs in Stark's possession is disputed, he admitted to declawing at least "about a dozen cubs" in 2016 alone.  (TRO Tr. 85:1 – 2).  Stark says he ultimately makes the decision to declaw Big Cat cubs:

> PETA: What is your criteria for deciding whether or not to declaw a big cat?
>
> Stark: I don't have to have criteria. I own the damn cat. If I want to have it declawed, I will have it declawed. That's my prerogative. I chose to do it. I declaw my house cats.
>
> PETA: Did you consult any veterinarians about whether you should declaw big cats?
>
> Stark: I don't need to declaw [sic] a veterinarian to whether – know whether I need to declaw a big cat. It's not the veterinarian's discretion, and I don't give a damn what any veterinarian's opinion is. I don't care.
>
> PETA: Is that a no?
>
> Stark: I mean, I've talked to them about it. I don't give a sh*t what their opinion is.

(PETA's First Submission at 11, Stark Dep. 139:10 – 25).

With respect to the actual procedure, Stark has used two veterinarians for declawing: Dr. Rick Pelphrey and Dr. Bill McDonald.  (PETA's First Submission at 104

4

– 130, Deposition of Rick Pelphrey ("Pelphrey Dep.") at 136:21 – 24; Filing No. 108, Transcript of Preliminary Injunction Hearing ("PI Tr.") at 6:16 – 7:8). Dr. Pelphrey typically uses a surgical scalpel or a guillotine to declaw the Cub and then uses tissue glue to close the wound. (Pelphrey Dep. at 136:25 – 137:11). He gives declawed Cubs a long-acting corticosteroid after the procedure; he usually does not prescribe any pain medications. (Pelphrey Dep. at 139:3 – 25). Dr. McDonald typically uses a laser and does not perform any follow-up care unless there is a complication. (PI Tr. at 13:5 – 14).

Stark also separates Big Cat Cubs from their mothers. (PETA's First Submission at 18, Stark Dep. 160:1 – 161:7). He has removed and separated a Cub from its mother as early as one day after birth. (*Id.*). Stark says he does this because the mothers have abandoned their cubs. (*Id.*). Stark believes it is in the best interest to pull Cubs from their mothers and raise them himself. (*Id.*).

**B.    Stark's License under the Animal Welfare Act and USDA Inspections**

Until recently, Stark has been licensed by the USDA to exhibit animals.[3] (TRO Tr. at 32:5 – 10). The USDA first granted Stark a license in 1999 when he formed WIN. (*Id.*). However, the USDA revoked Stark's license on February 3, 2020. (Filing No. 359-

---

[3] A person who exhibits Big Cats must be licensed under the Animal Welfare Act, 7 U.S.C. § 2131 *et seq.* ("AWA"). *See* 7 U.S.C. § 2131; 9 C.F.R. § 2.1; *Graham*, 261 F.Supp.3d at 737 – 38. The AWA is a complimentary statute to the ESA and sets forth standards for proper care and treatment of animals exhibited to the public. *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142, 1149 (11th Cir. 2018); *Graham v. San Antonio Zoological Society*, 261 F.Supp.3d 711, 738 (W.D. Tex. 2017). The USDA administers and enforces the AWA. 7 U.S.C. §§ 2146, 2132(b); *see also Graham*, 261 F.Supp.3d at 737 – 38. Part of that responsibility includes determining whether to grant a license to an exhibitor or revoke an already issued one. *Graham*, 261 F.Supp.3d at 738.

1, PETA's Evidence in Support of Emergency Petition at 57, USDA Termination Letter at 1).

The decision to revoke Stark's license was based, in part, on Stark's checkered history with USDA inspections.  In 2013, the USDA cited Stark for not having an attending veterinarian to treat animals at WIN's facility.  (Filing No. 57-3, USDA Inspection Report, June 28, 2013 at 1).  During that inspection, Stark also admitted to euthanizing a leopard without discussing treatment with a veterinarian.  (*Id*.).  In September of 2014, the USDA cited Stark for improperly handling Cubs during the Tiger Baby Playtime:

**2.131      (c)    (1)                    REPEAT**

**HANDLING OF ANIMALS.**

On Tuesday August 19th, 2014  two inspectors from USDA/AC attended the 6pm 'Tiger Playtime' at the facility. During this encounter up to 30 members of the public are allowed to sit in an area surrounded by fence panels under a tent where two tiger cubs (said to be 14 weeks of age and approximately 25-30lbs) were let into the room to interact freely with the adults and children present.  During the show, the licensee was in the area for the first part of the event with one assistant.  When the Licensee left, another assistant entered the area.  Before the release of the white tiger into the room, the licensee aggravated the tiger by grabbing her by the scruff and bouncing her up and down on his lap and ground while the tiger hissed, growled, and bit at his glove covered hands. The tiger's ears were pinned to the side of its head during that part of the encounter and was not acting in a relaxed manner. As described by the Licensee, the tiger was "pissed off".  While the tiger was agitated, the licensee dropped the tiger in the lap of the unsuspecting member of the public sitting next to him. The tiger jumped off this man's lap with its ears still pinned to its head.  The tiger then walked away and flopped onto the floor. At this time the tiger's ears returned to a normal un-agitated position and another tiger was released into the room. The tigers walked, played, and jumped around on many members of the public.  People were lying down next to them, petting them and taking photos with them during the length of the event.

(USDA Inspection Report, September 8, 2014 at 2).  The following year, USDA cited Stark for dragging cubs who were exhausted out into the Tiger Baby Playtime room and using a riding crop to swat the cubs to discipline them:

On Sunday Sept 13, 2015 two APHIS officials attended the 2 pm Tiger Playtime at this facility. There were approximately 40 to 50 members of the public in attendance, which included one new born baby, one toddler and approximately 10 other children under 10 years of age. The attendants gave a few instructions on keeping fingers or other body parts out of the cub s mouth and instructed the public to stay seated but crawl or move around as much as possible. The gate to the cub area was opened and two cubs walked out. One cub appeared to be asleep and was dragged out by its front feet, the fourth cub was pushed out from behind. According to the attendants these cubs were 16 weeks old and weighed 35 to 40 lbs. There were seven attendants present, mostly young people. The owner was not present until the photo opportunity after the Playtime. Each cub, except for the non-responsive cub, had an attendant who tried to stay with their cub at all times. The cubs had no collars or leashes on them. These attendants had a riding crop they used to swat the cubs nose if the cub started to bite. The attendants could not always keep up with the cubs as the cubs would leap through the crowd. At these points the cubs were outside of their direct control. The cubs were swatted frequently with the riding crops when the attendants were near them. Some of the swats were excessive in severity causing the cubs obvious discomfort.

(USDA Inspection Report, Sept. 14, 2015 at 2).

### C.    The Present Lawsuit

PETA is an animal rights organization dedicated to protecting animals.

(Complaint ¶ 73). PETA brought this action on September 29, 2017 to carry out its

mission and programs. (*Id.* ¶ 74).

### 1.    The Court Preliminarily Enjoins the WIN Defendants

The court conducted a hearing on PETA's motion for a temporary restraining order

October 19, 2017. (Filing No. 25). At this hearing, the court heard testimony from Stark

about his plans to declaw Big Cats in the future. The court temporarily restrained him

from declawing any cats absent a medical necessity supported by a veterinarian's opinion.

(Filing No. 25).

The court then conducted a preliminary injunction hearing on January 24, 2018.

PETA presented the testimony of WIN's veterinarian, two expert witnesses, and a variety

of exhibits ranging from photographs to USDA inspection reports to support their claims

that the WIN Defendants violated the ESA. (*See* PI Tr. at 1 – 120); *see also People for

the Ethical Treatment of Animals, Inc. v. Wildlife in Need and Wildlife in Deed, Inc.,* No.

4:17-cv-00186-RLY-DML, 2018 WL 828461 (S.D. Ind. Feb. 12, 2018).

PETA started by examining Dr. McDonald, WIN's former veterinarian who had declawed at least five animals on WIN's property. (PI Tr. at 6:16 – 7:8). He confessed he was uniformed about declawing and said he never planned on declawing again. (*Id.* at 7:24 – 8:23). He testified no one at WIN had told him that the USDA directed Stark to stop declawing Big Cats. (*Id.* at 7:16 – 20).

PETA's then presented its first expert, Dr. Jenifer Conrad, D.V.M. *Wildlife in Need,* 2018 WL 828461, at *3 – 4. Dr. Conrad is a veterinarian practicing in Los Angeles, California. (PETA's First Submission at 43 – 103, Expert Report of Jennifer Conrad at 44). She holds a Doctorate of Veterinarian Medicine from the University of California, Davis, and currently provides care for approximately 30 lions and tigers. (*Id.*). She explained declawing is a surgical procedure called "onychectomy" during which the animal's distal interphalangeal joints are amputated. *Wildlife in Need*, 2018 WL 828461, at *3 – 4. Declawing is an irreversible procedure that permanently removes the distal phalanx and severs nerves, ligaments, tendons, and blood vessels. *Id.* Dr. Conrad testified that declawed Big Cats can suffer a lifetime of pain. *Id.* She explained declawing likely will result in permanent lameness, arthritis, abnormal standing conformation, and other long-term complications. *Id.* In her opinion, declawing violates acceptable veterinary medical standards, generally accepted husbandry practices, and medical guidance from the USDA. *Id.* She also explained in her opinion that four of the WIN Defendants' Big Cats died from complications resulting from the declawing procedure. *Id.*

PETA next offered the testimony of Jay Pratte, M.S. *Id.* at 4. Pratte is the behavioral, husbandry, and welfare manager at Omaha's Henry Doorly Zoo and Aquarium in Omaha, Nebraska. (PETA's First Submission at 131 – 266, Expert Report of Jay Pratte ("Pratte Rep.") at 117). He has over 28 years of experience training domestic and exotic cats, including every member of the Big Cat family. (Pratte Rep. at 2 – 3). Pratte testified that declawing causes behavioral harm to Big Cats. *Wildlife in Need*, 2018 WL 828461 at *4. He explained Big Cats are born with a set of behaviors, predispositions, and expectations; declawing disrupts those norms by creating different stress responses to the procedures. *Id.* Those responses can change a Big Cat's physiology, brain, and hormone system which in turn affects the Big Cat's ability to walk, run, jump, climb, and scratch. *Id.* Pratte also testified prematurely separating Cubs from their mothers and using them in Tiger Baby Playtime cause behavioral harm to Big Cats. *Id.* He explained Big Cat Cubs usually stay with their mothers for at least two years following birth. *Id.* By depriving Cubs of this time with their mothers, the WIN Defendants, according to Pratte, have stunted the Cubs' growth and ability to nurse, learn, and develop healthy behaviors. *Id.* This is exacerbated when the Cubs are forced into Tiger Baby Playtime. *Id.* Pratte explained Big Cat Cubs experienced abnormal stressors of extreme frequency, intensity, and duration during these encounters. *Id.* This exposure, says Pratte, creates a long-lasting harm to the Cubs' behavior. *Id.*

Based on the evidence submitted, the court preliminarily enjoined the WIN Defendants on February 12, 2018 from declawing their Big Cats, prematurely separating

Big Cat Cubs from their mothers, and using Cubs in Tiger Baby Playtime.  (Filing No. 89); *see also Wildlife in Need*, 2018 WL 828461, at *8.

### 2.    The WIN Defendants' Conduct During the Course of this Litigation

The reader may wonder why the court did not discuss any of the WIN Defendants' evidence opposing an injunction.  That is because there was none.  They ignored their discovery obligations prior to the hearing: Stark and Lane did not respond to PETA's interrogatories, they refused to schedule their depositions, and they improperly objected to PETA's motions for inspections.  (Filing No. 51, Order on PETA's Renewed Motion to Compel at 1).  As a result, the court limited the WIN Defendants only to offering evidence that had been disclosed prior to the hearing—which ended up being nothing. (*See generally* Filing No. 73, Order on PETA's Motion for Sanctions) (discussing the WIN Defendants unwillingness to participate in discovery).

Regrettably, this type of conduct has plagued the WIN Defendants throughout this litigation.  Since this case arrived in federal court, they have refused reasonable requests for discovery and ignored the rules and procedures for litigation.  This has forced the court—multiple times—to step in and order the WIN Defendants to participate.  (Filing No. 39, Scheduling Order at 1 – 3) ("The Court is very troubled that the defendants have wholly failed to respond timely to the interrogatories and document requests and have not meaningfully engaged in the discovery process . . . ."); (Filing No. 51, Order on PETA's Motion to Compel at 3) ("The defendants' recalcitrant discovery behavior will not be tolerated."); (Filing No. 73, Order on PETA's Motion for Sanctions at 8) (prohibiting the

10

WIN Defendants from offering evidence at the preliminary injunction hearing); Filing

No. 113, Entry and Order from Show Cause Hearing at 2) (ordering the WIN Defendants

to supplement discovery); (Filing No. 178, Order on Motion to Compel and Requiring

Each Defendant to Show Cause Why an Entry of Default Should not be Entered at 2)

("The Court agrees with PETA that the defendants continue to defy the court's orders and

shirk their discovery obligations.").

Worse, the WIN Defendants have not just refused to participate in discovery, but

they have refused to follow court orders.  The Court preliminarily enjoined the WIN

Defendants from separating Cubs from their mothers absent a medical necessity and

supporting statement from a veterinarian.  On May 31, 2018, Stark filed a "memo" stating

that he removed a Cub from its mother because the Cub was found out of the den box and

not being tendered to by its mother.  (Filing No. 120, Stark Letter to the Court).  He also

stated he did this *after* consulting with his veterinarian.  (*Id.*).  This was a lie.  Later text

messages between Stark and the veterinarian, Dr. Pelphrey, showed Stark did not consult

Dr. Pelphrey beforehand:

> Yo Doc, I had a baby tiger born on [M]arch 19th and there was only one in
> the litter. Everything seemed to be going good but then Friday afternoon I
> went out there and the momma seemed spooked or something and the baby
> was laying outside of the nest box so I tried putting it back in the box and
> locking the momma on that side of the enclosure but she didn't want anything
> to do with the baby. I kept an eye on the situation the rest of the day and that
> night and the next day it never got any better, so I went Sunday morning and
> pulled the baby. According to the court bullsh*t I'm not supposed to pull
> babies unless it's an emergency. The court paperwork says I'll need some
> stupid bullsh*t written up by you saying what I did was necessary.

11

(Filing No. 126, PETA's Brief in Support of Motion for Sanctions at 4); (*see also* Filing No. 193, Order Granting PETA's Motion for Sanctions at 5 – 8) (describing the incident).

The court also ordered the WIN Defendants to preserve all evidence in this case, including all Big Cats on their property.  On September 18, 2017, the court issued an agreed-upon preservation order which required the WIN Defendants to "preserve all tangible and documentary evidence relating to (and including) the tigers, lions, and hybrids thereof in [Defendants'] possession, custody, and control."  (Filing No. 239, Order Granting PETA's Motion to Clarify at 3); *see also People for the Ethical Treatment of Animals, Inc. v. Wildlife in Need and Wildlife in Deed, Inc. et al.*, No. 4:17-mc-00003-RLY-DML (S.D. Ind. 2017) (Filing No. 27).  Early in 2019, however, Stark transferred ownership of several Big Cats to Jeff Lowe[4], a zoo owner in Oklahoma with whom Stark intended to form a partnership.  (Filing No. 239, Order Granting PETA's Motion to Clarify at 4 – 5).  The court then issued an order clarifying the preservation order and directing both Stark and Lowe to keep the Big Cats in Indiana.  *After the court issued that order*, Stark filed a "notice" with the court saying that four Big Cats had been born at WIN and then transferred to Oklahoma.  (Filing No. 260).

This recent transfer resulted in another round of sanctions motions from PETA. PETA has requested the court issue terminating sanctions and enter a default judgment against the WIN Defendants.  The court does not enter terminating sanctions because this matter can be decided on the merits; however, it is not lost on the court that the WIN

---

[4] This transfer brought Lowe into the case as an additional defendant.  PETA's present motion for summary judgment does not address Jeff Lowe.

Defendants' conduct has fallen woefully short of what is expected out of federal court litigants.[5]

## II.    Discussion

Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Dollard v. Whisenand*, 946 F.3d 342, 353 (7th Cir. 2019).  When tasked with resolving cross motions for summary judgment, the court construes the facts and draws all reasonable inferences against whom the motion is made.  *Markel Ins. Co. v. Rau*, 954 F.3d 1012, 1016 (7th Cir. 2020).  Only a genuine dispute precludes summary judgment; irrelevant ones do not.  *Carroll v. Lynch*, 689 F.3d 561, 564 (7th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A genuine dispute of material fact exists if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party."  *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018) (internal quotations and citation omitted).

### A.    The Endangered Species Act

The ESA is a product of a decade-long push for animal rights legislation.  *See generally Tennessee Valley Authority v. Hill*, 437 U.S. 174 – 175 (1978) (discussing the history of the ESA); *see also* Frederico M. Cheever, *An Introduction to the Prohibition*

---

[5] The WIN Defendants have offered many excuses for their conduct.  They have claimed their original attorney is to blame for the discovery violations.  They have asserted PETA's extreme litigation tactics are unconscionable.  And they have maintained they have fully complied with the court's orders to the best of their abilities.  But none of their excuses justifies their conduct, which has unnecessarily prolonged this litigation and invited additional expenses in the form of sanctions.

*Against Takings in Section 9 of the Endangered Species Act of 1973: Learning to Live with a Powerful Species Preservation Law*, 62 U. Colo. L. Rev. 109, 122 – 25 (1991) (same). During the first half of the 1960s, the public grew increasingly concerned over the loss of different species of fish and wildlife. Congress responded with the Endangered Species Act of 1966, the first piece of federal legislation designed to protect and conserve endangered species and their habitats. *Hill*, 437 U.S. at 174 – 75; Cheever, 62 U. Colo. L. Rev. at 123. The 1966 Act granted the Secretary of the Interior authority to designate species threatened with extinction and purchase land for their conservation. *Hill*, 437 U.S. at 174 – 75. The 1966 Act, however, came with limitations: it only prohibited taking animals on national wildlife refuge land, and even then, it authorized the Secretary of the Interior to allow hunting and fishing of threatened species. *Id.* at 175 – 76. Congress tried again in 1969, enacting the Endangered Species Conservation Act. *Id.* The 1969 Act increased federal involvement and prohibited certain transfers of wildlife. *Id.* Yet that Act still lacked meaningful application. It only applied to species "threatened with worldwide extinction based on the best scientific and commercial data available." Cheever, 62 U. Colo. L. Rev. at 124 (internal quotations omitted).

Three times proved to be the charm: Congress passed the present version ESA in 1973. Congress found a more robust act necessary because "many of the species threatened with extinction [were] of 'esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people[]'" and that "'various species of fish, wildlife, and plants in the United States [had] been rendered extinct as a consequence of economic growth and development untampered by adequate concern and

14

conservation.'" *Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000) (quoting 16 U.S.C. § 1531(a)(3) and § 1531(a)(1)).  The ESA "represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Hill*, 437 U.S. at 180.  And its breadth makes clear that Congress sought to broadly prohibit any taking of endangered species.  *Id.* at 184 ("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost.").

Multiple agencies administer the ESA.  Section 4 of the Act directs the Secretary of the Interior to list threatened and endangered species of plant and wildlife and the Secretary of Commerce to list threatened and endangered species of marine life. *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 651 (2007) (citing 16 U.S.C. § 1533); *Center for Biological Diversity v. United States Fish and Wildlife Serv.*, --- F.Supp.3d ---, 2020 WL 620834, at *4 n. 9 (D. Ariz. Feb. 10, 2020). The United States Fish and Wildlife Service ("FWS") then administers the ESA with respect to species of plants and wildlife, and the National Marine Fisheries Service administers the Act with respect to species of marine life.  *National Ass'n of Home Builders*, 551 U.S. at 651; *see also* 50 C.F.R. § 402.01(b).  The Secretary of the Interior has listed Big Cats as a threatened or endangered species (depending on the specific subspecies).  *See* 50 C.F.R. § 17.11(h).

Liability under the Act stems from Section 9.  That section prohibits any person from "taking" any endangered species with the United States or the territorial sea of the United States.  16 U.S.C. § 1538(a)(1)(B); *Hill*, 437 U.S. at 184; *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 690 – 91 (1995).  The Act

15

defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532; *Strahan v. Coxe*, 127 F.3d 155, 162 (1st Cir. 1997) (noting "take" is defined broadly to encompass every conceivable way in which a person can "take" an endangered species) (citing S.Rep. No. 93–307, at 7 (1973)).

FWS promulgated regulations further defining several of those terms. "Harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns [including] breeding, feeding, or sheltering." 50 C.F.R. § 17.3. That definition, when applied to captive wildlife, does not include generally accepted "[a]nimal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act." *Id.* "Harm" means any act "which actually kills or injures wildlife." *Id.* "Wound" means to inflict a physical injury. *Graham*, 261 F.Supp.3d at 741 n. 15 (citation omitted). "Wound" can also include the piercing or laceration of the animal's skin. *Wildlife in Need*, 2018 WL 828461, at *6.

Section 11 of the ESA allows any person to enjoin any other person who violates the Act. 16 U.S.C. § 1540(g)(1)(A). "Congress included this provision to encourage private citizens to force compliance with the Act for the benefit of the public interest." *Animal Welfare Institute v. Beech Ridge Energy, LLC*, 675 F.Supp.2d 540, 545 (D. Md. 2009) (citing *Bennett v. Spear*, 520 U.S. 154, 165 (1997)).

16

B.    **PETA's Motion for Partial Summary Judgment**

PETA moves for partial summary judgment on two grounds: (1) the WIN Defendants have harmed, harassed, and wounded Big Cats by declawing them, and (2) they have harmed, harassed, and wounded Big Cat Cubs by prematurely separating them from their mothers and using them in Tiger Baby Playtime. The WIN Defendants insist that neither act violates the ESA. The court considers each in turn.

1.    **The WIN Defendants Have Harmed, Harassed, and Wounded Big Cats by Declawing Them without any Medical Necessity.**

The court concluded declawing constitutes a "taking" under the ESA at the preliminary injunction stage, and there is no good reason to disturb that conclusion. Dr. Conrad explained declawing is the surgical procedure of amputating the last bone (or knuckle) of a Big Cat's phalange (or digit)—a conclusion with which even the WIN Defendants' veterinarian agrees. (Conrad Rep. ¶ 8; *see also* Pelphrey Dep. at 186:13 – 187:17). During the procedure, the Big Cat's bone, tendons, nerves, ligaments, and blood vessels are severed. (Conrad Rep. ¶ 8). This can cause pain and impair a Big Cat's ability to engage in normal behaviors such as walking, climbing, or scratching. (*Id.* ¶¶ 7, 23). PETA's behavioral expert, Pratte, explained declawing creates stress responses that affect a Big Cat's physiology, brain, and hormone systems which can in turn affect the Big Cat's ability to engage in normal behaviors. (Pratte Rep. at 2 – 3). The USDA has explained declawing causes ongoing pain to Big Cats:

17

The declawing of large exotic felines is well known to cause ongoing pain, discomfort, or other pathological conditions in the animals. In addition, declawing does not safeguard the public or the animals from biting and other predatory behaviors. The routine declawing of wild and exotic carnivores does not constitute appropriate veterinary care. Additionally, the failure to have animals showing clinical signs of disease, injury, or illness examined by a veterinarian can result in delays in proper treatment and prolonged suffering.

(Filing No. 76-3, USDA Inspection Report, March 18, 2017 at 27). The American Veterinarian Medicine Association condemns declawing. (Stark Dep. 151:15 – 22).

On top of that, the WIN Defendants also declaw without a medical necessity or any post-operative treatment. Stark admitted he declaws Big Cats so that he can handle them easier—not for any medical reason. (TRO Tr. 84:23 – 25; 86:10 – 13). He also admitted that he would continue to declaw them even after USDA told him to stop in 2017. (USDA Inspection Report, March 18, 2017 at 27; TRO Tr. 33:15 – 17; 82:10 – 11; *see also* Stark Dep. 156:15 – 20 (Q: If not for the preliminary injunction, would you continue to declaw big cats? A: Damn right I would. There's no law or regulation against it. This is nothing more than a judge's, you know, decision based on the threat of PETA.")). With respect to post-operative treatment, neither Dr. Pelphrey nor Dr. McDonald prescribed any pain medication for the Big Cats after the procedure, (Pelphrey Dep. at 139:3 – 25; PI Tr. at 13:5 – 14)—a gross failure to meet the accepted standards of medical care. (Conrad ¶ 23). In fact, Dr. Pelphrey agreed Big Cats experience pain after the procedure; he just said they do not require medication. (Pelphrey Dep. 195:13 – 23).

What's more, the declawing in this case *actually* caused significant harm. Dr. Pelphrey explained he started the procedure by stopping the blood flow to the paw by creating a tourniquet. (Pelphrey Dep. 187:3 – 11). From there, he uses a scalpel or a

guillotine to dissect down the particular joint and cut off the end of the digit—kind of like "a sliding set of nail [clippers] that removes that area."  (*Id.*).  He then closes the wound with some sort of closure, usually suture material or suture glue.  (*Id.* at 187:12 – 14).  Although Dr. Pelphrey administers general anesthesia, he does not administer local anesthesia, and he conducts the procedures at WIN's facility, not a dedicated surgical site.  (Pelphrey Dep. 141:24 – 142:25; *see also* USDA Inspection Report, March 18, 2017 at 27).

Two of the cubs declawed by Dr. Pelphrey died from ringworm infections following the procedure.  (Conrad Rep. ¶ 5).  Dr. Pelphrey admitted that he "botched" the aftercare relating to the declawing procedure by treating both Cubs with Animalintex, a wound dressing used on horses which happens to be toxic for cats.  (Pelphrey Dep. 160:2 – 162:18).  Several days after the procedure, the two Cubs' paws started swelling:





(PETA's First Submission at 425, 427).  Two weeks after the procedure, Stark hid the

Cubs from USDA inspectors, and when inspectors found the them, Stark explained that

Pelphrey had "botched" the job.  (USDA Inspection Report, March 28, 2017 at 27 – 28).

Inspectors also observed the two Cubs in pain:

Both cubs were brought outside for inspection in a crate that was approximately 24 inches long by 18 inches wide. Neither animal would walk from the crate onto the wooden deck for inspection. The facility representative had to physically remove each animal. Once removed it was evident that both tigers had significantly swollen paws and limbs and were reluctant to walk. Additionally both cubs appeared distressed, they vocalized nearly the entire time that they were on the deck.
When placed on the deck, the orange tiger cub immediately sprawled on the decking material (laying down). After persuasion by a facility representative it moved slowly for only short periods of time before resting in front of the

inspectors. After each step there were spots of blood left on the decking from the front paws. The white tiger cub was very reluctant to move. It walked only when prompted, and when it did so, this animal was severely lame dragging the hind limb and only occasionally bearing very little weight on it. This cub consistently laid down and appeared to be suffering throughout the inspection.

(*Id.*).  The two Cubs eventually died, likely as a result of the declawing procedure.

(Conrad Rep. ¶¶ 41 – 43, 53).

Pictures and videos taken by PETA during inspections show the declawing

procedures have harmed other Cubs too:



21

(Filing No. 317-2, PETA's Second Submission at 7; *see also* Conrad Rep. ¶¶ 50, 57 – 62 (citing PETA's video inspection and discussing complications from other Big Cats' that have been declawed)).

Given all of this, the court is satisfied the WIN Defendants' declawing constitutes a "taking" under the ESA: it "harasses" Big Cats by creating a likelihood of significantly disrupting normal behavioral patterns; it "harms" Big Cats by actually injuring them; and it "wounds" Big Cats by inflicting a physical injury.  50 C.F.R. § 17.3; *Graham*, 261 F.Supp.3d at 741 n. 15.

The WIN Defendants resist this conclusion.  They admit to declawing Big Cats but contend declawing does not harm, harass, or otherwise wound them.  But whether declawing creates a likelihood of significantly disrupting normal behavioral patterns (harasses), actually injures (harms), or inflicts a physical injury on (wounds) Big Cats requires expert testimony.  *See Graham*, 261 F.Supp.3d at 751 – 752; *see People for the Ethical Treatment of Animals, Inc., v. Miami Seaquarium*, 189 F.Supp.3d 1327, 1355 (S.D. Fla. 2016), *aff'd*, 879 F.3d 1142 (11th Cir. 2018), *adhered to on denial of reh'g*, 905 F.3d 1307 (11th Cir. 2018); *see Rowley v. City of New Bedford, Mass.*, 413 F.Supp.3d 53, 67 (D. Mass. 2019); *Kuehl v. Sellner*, 161 F.Supp.3d 678, 701 – 09 (N.D. Iowa 2016), *aff'd*, 887 F.3d 845 (8th Cir. 2018).  And the WIN Defendants have no expert testimony to create a *genuine* factual dispute on this issue.  Consider their evidence. [6]

---

[6] The WIN Defendants never disclosed any expert by the deadline.  (Filing No. 304).  On top of that, much of their evidence in support of their response was never disclosed in discovery.  The court ordinarily would strike such evidence.  But since the evidence is immaterial, the court resolves it on the merits.

22

*Stark's Affidavit and Testimony.*  The court does not consider Stark's affidavit because it is nothing more than a sham affidavit.  *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020).  Stark testified during the TRO hearing, he sat for a deposition, and there is no allegation that this prior testimony was confusing or mistaken.  *Id.* at 317.  The court therefore disregards his affidavit attached to the WIN Defendants' response brief.  Regarding his other opinions (those offered through his testimony), they do not create a genuine factual dispute because Stark is not an expert.  *See Robinson v. Davol Inc.*, 913 F.3d 690, 695 (7th Cir. 2019).  Stark lacks any formal education on Big Cat husbandry, his opinions are not based on any reliable methodology—just simply his opinions—and he does not explain the methodology for his opinions.  (*See* Stark Dep. 139:1 – 140:22; 150:7 – 154:9).  Although Stark has operated WIN for twenty years and says he genuinely cares about his Big Cats, that is not enough to admit his testimony as expert testimony.  *See generally Robinson*, 913 F.3d at 695 – 696 (discussing standards for expert testimony); *see also Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989) ("Judges should not be buffaloed by unreasoned expert opinions.").  Since Stark is not an expert, his affidavit (even if considered) and testimony do not create a genuine dispute for trial.  *See Pettit v. Retrieval Masters Creditor Bureau, Inc.*, 211 F.3d 1057, 1062 (7th Cir. 2000); *see also Winters-El v. Hawk*, 85 F.3d 632, at *1 (7th Cir. 1996) (unpublished).

*Affidavits of WIN Volunteers.*  The WIN Defendants have offered nearly a dozen affidavits from WIN volunteers who all say declawing does not harm Big Cats and they have never witnessed complications from the procedure.  (*See* Filing No. 349-1, WIN

23

Defendants' Index, Exhibits No. 6 – 11; 19 – 25; 39 – 40, 42; Filing Nos. 352 – 354).  But these affidavits do not create a *genuine* dispute because—like Stark—none of the volunteers is qualified to give expert testimony.  They all lack formal education with respect to animal husbandry, and the only training they received was from Stark himself.  Their testimony does not create a genuine factual dispute.  *Pettit*, 211 F.3d at 1062.

*Dr. Pelphrey's Testimony*.  Assuming Dr. Pelphrey is qualified to opine on Big Cats (which is not at all clear), the WIN Defendants have not pointed to any testimony where Dr. Pelphrey opines declawing does not harass, harm, or wound a Big Cat.  To the extent a jury could infer that belief from the fact that Dr. Pelphrey performed the procedure, that inference is not supported by a sufficient foundation as there is no testimony explaining why he believes declawing does not harm Big Cats.  Quite the contrary.  He admitted declawing involves severing the distal phalanx (digit) and causes Big Cats pain.  (Pelphrey Dep. at 186:13 – 187:17; 195:13 – 23).  His testimony therefore does not create any question of fact.

*American Veterinarian Medical Association Article on Declawing Domestic Cats*.  The WIN Defendants have cited an AVMA article that reviews the literature on the welfare implications of declawing domestic cats.  (*See* Filing No. 352, the WIN Defendants' Submission at 18 – 29).  That article supposedly creates a question of fact because Dr. Conrad admitted there is little difference between declawing house cats and Big Cats.  (PI Tr. 42:8 – 12).  But there are several reasons why this does not create a factual issue.  Number one: it is hearsay because the WIN Defendants do not have anyone to demonstrate its reliability.  *See* Fed. R. Evid. 803(18); *Eisenstadt v. Centel Corp.*, 113

24

F.3d 738, 742 (7th Cir. 1997); *see also Baker v. Barnhart*, 457 F.3d 882, 891 – 92 (8th

Cir. 2006); *In re C.R. Bard, Pelvic Repair System Product Liability Litigation*, 810 F.3d

913, 924 – 25 (4th Cir. 2016).  Number two: the article point-blank says it is merely a

*summary* of the literature and should not be construed as official AVMA policy.[7]  (The

WIN Defendants' Submission at 18 – 29).  And number three: the ESA does not regulate

domestic species; it regulates endangered and threatened species.  That Congress chose to

regulate one and not the other is merely a function of Congress's ability to remedy

problems as it sees fit.  *Peick v. Pension Ben. Guar. Corp.* 539 F.Supp.1025, 1058 (N.D.

Ill. 1982) ("Congress was not obligated to choose between attacking every aspect of the

problem or not attacking the problem at all . . . Congress had a third-option to remedy

only those evils which it reasonably believed to require immediate attention.") (internal

quotations and citations omitted).  And it was rational to proscribe conduct as it relates to

endangered and threatened species given their status.  *United States v. Vaello-Madero*,

956 F.3d 12, 18 (1st Cir. 2020) (absent a protected class, legislative classifications are

sustained if they are rationally related to a government interest).  The use of the AVMA

article does not help the WIN Defendants.

Even if the WIN Defendants' evidence somehow created a genuine factual dispute

as to whether declawing—generally—violates the ESA, there is no dispute that *the WIN

Defendants' declawing* violates the ESA.  Their veterinarian did not declaw at surgical

---

[7] In fact, PETA says the AVMA now discourages declawing as an elective procedure.  (Filing No. 370, PETA Reply Brief at 19) (citing https://www.avma.org/javma-news/2020-03-01/avma-revises-declawing-policy).

site; he severed the Cubs' claws using a scalpel or guillotine; he admits the procedure causes pain but did not prescribe any pain medication or post-operative care; two cubs died as a result of the veterinarian's "treatment"; and others suffered from swollen paws and long-term adverse effects. (March 28, 2017 USDA Inspection Report at 26 – 29; Conrad Rep. ¶ 56 – 62; Pratte Rep. ¶ 40 – 50). No reasonable factfinder could find otherwise.

The WIN Defendants also object on purely legal grounds. They say the ESA does not regulate their conduct because animal exhibitors are regulated by the AWA. But the court has already considered and rejected this argument. (Filing No. 88, Entry on Defendants' Motion to Dismiss).

The rest of the WIN Defendants' objections are either irrelevant or legally flawed. Since they have not offered any evidence to create a question of fact, the court finds the WIN Defendants' declawing violates the ESA.

### 2.    The WIN Defendants Have Harmed and Harassed Big Cats by Prematurely Separating Them from their Mothers and Using Them in Tiger Baby Playtime.

Though the preliminary injunction only dealt with Tiger Baby Playtime and the ESA's anti-harassment provision, the evidence is clear that the WIN Defendants have both harmed and harassed Big Cat Cubs by prematurely separating them from their mothers and using them in Tiger Baby Playtime.

*Premature Separation.* Big Cat Cubs typically remain with their mother after birth to nurse and receive nutrients, colostrum, and antibodies. (Pratte Rep. ¶ 52). Some begin to wean around six months while other Cubs continue to nurse for up to two years.

(*Id.* ¶ 53; Conrad Rep. ¶ 72).  Separating Cubs from their mothers before this time deprives them of vital components that help develop a healthy immune system.  (Pratte Rep. ¶ 52).  A healthy immune system provides defense against disease and parasites through the rest of the Cub's life.  (*Id.*).  Prematurely separating Cubs from their mothers deprives Cubs of these benefits and also creates unnecessary stress which can affect a Big Cat's normal behavior and immune system.  (*Id.* ¶¶ 51, 52).

Stark admits he pulls every Big Cat Cub born on his property.  (Stark Dep. 160:1 – 161:7).  He has separated a Cub from his mother as early as one day after birth.  (*Id.*).  At the time of briefing, PETA has identified at least thirty-five cubs separated from their mothers.  (PETA's First Submission at 32 – 35).  Stark also admits he has received Cubs from other exhibitors.  (Stark Dep. 277:1 – 25).  Joe Maldonado-Passage (also known as Joe Exotic) shipped cubs—some younger than a week—from his facility in Oklahoma to WIN's facility in Indiana, which is roughly a twelve-hour trip.  (*Id.*).  The transporter—John Finlay—stated in deposition that he transported Big Cat Cubs as young as three days old from Joe's facility to WIN.  (Filing No. 317, PETA's Third Submission at 27 – 30, Deposition of John Finlay at 13:2 – 14:22).  Though Stark did not physically separate these Cubs, he hosted Tiger Baby Playtime, which created a demand for young Cubs.

*Tiger Baby Playtime*.  The use of the Cubs in Tiger Baby Playtime affects Big Cat Cubs' normal behavior.  Big Cat Cubs naturally rest and sleep with their mothers for long periods of time.  (Pratte Rep. ¶ 52; Conrad Rep. ¶ 70).  They nurse with their mothers in a prone position.  (Pratte Rep. ¶ 58).  And they stay in a relatively calm and secluded environment, one that does not include much external stimuli.  (Pratte Report ¶ 59).

During Tiger Baby Playtime, however, they cannot sleep—often forced to interact with the public; they eat in an extremely stressful environment, sometimes in an unnatural position; and they cannot escape the public touching and petting them:



(Cub during Tiger Baby Playtime)



(Filing No. 317-4, PETA's Fourth Submission at 8 and 10; *see also id.* at 6).  Pratte explained removing Cubs from their natural environment and using them in Tiger Baby Playtime forces them to develop a different behavioral repertoire that conflicts with their natural instincts.  (*Id.* ¶ 51).

Tiger Baby Playtime also subjects Cubs to extreme stress.  (Pratte Rep. ¶ 59). They do not get adequate rest, they are often handled and touched by members of the public, and they are subject to abusive disciplinary measures.  (Pratte Rep. ¶¶ 56 – 60; Conrad Rep. ¶¶ 66 – 72).  The USDA inspection reports discussed earlier highlight these problems.  (USDA Inspection Report Sept. 14, 2015 at 2; USDA Inspection Report Sep. 8, 2014).  Dr. Conrad explained the abusive discipline is particularly concerning: Cubs are clearly not trained, so being hit or struck by riding crops results in confusion and psychological harm.  (Conrad Rep. ¶ 69).  And Pratte opined that these Cubs will develop atypical behavioral patterns—such as an increase in aggression—because they are forced to adjust to this unnatural environment.  (Pratte Rep. ¶ 70).

This leaves little room to doubt that prematurely separating Cubs and using them in Tiger Baby Playtime violates the ESA.  Such conduct constitutes harassment because it creates a likelihood of injury to Big Cat Cubs by annoying them to such an extent as to significantly disrupt normal behavior patterns.  *See* 50 C.F.R. § 17.3.  And such conduct harms Big Cat Cubs because it actually injures them.  *Id.*

The WIN Defendants respond with two points.  Neither is persuasive.  First, they contend prematurely separating Cubs from their mothers does not actually harm the Cubs.  They say Stark and the volunteers' care for the Cubs meets the standards of the

AWA and the Association of Zoos and Aquariums.  But keeping in step with the court's findings as to declawing, the WIN Defendants have no expert to support those allegations or that premature separation and the use of Cubs in Tiger Baby Playtime do not violate the ESA.  *Graham*, 261 F.Supp.3d at 751 – 752.  Stark and the volunteers are simply not qualified to give such an opinion.  The WIN Defendants also say they comply with the standards set forth in the Association of Zoos & Aquariums ("AZA") manual.  This fails to create a question of fact for several of the same reasons the AVMA article failed to create a question of fact with respect to declawing: it is hearsay, there is no expert who can show its reliability, and it is not entirely relevant—after all it does not address prematurely separating Cubs for the use in hands-on public interactions.

The WIN Defendants insist they have not violated the ESA because other zoos supposedly engage in the same conduct.  But they have not shown their conduct—pulling Cubs less than a week old to use in Tiger Baby Playtime—is substantially similar to other zoos' conduct nor have they otherwise properly laid a foundation to admit such evidence.  *See Lolie v. Ohio Brass Co.*, 502 F.2d 741, 745 (7th Cir. 1974).  Simply saying "other zoos do it too" is insufficient to create a question of fact.

As a final point, the WIN Defendants urge this court to adopt the standard set forth in *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, where the Eleventh Circuit held "harm" or "harass" under the ESA is only actionable if it poses a threat of *serious* harm.  879 F.3d 1142, 1150 (11th Cir. 2018).  Putting aside whether that is the best reading of the statute, that standard is easily met here as the evidence demonstrates declawing and prematurely separating Cubs from their mothers for Tiger

Baby Playtime poses a *serious* harm—in many cases a deadly one.  For all of those reasons, PETA's Motion for Partial Summary Judgment is **GRANTED**.

### C.    Stark's Motion for Partial Summary Judgment

Stark has filed his own motion for summary judgment arguing there is no legal basis for the remedies PETA seeks.  He contends PETA's Complaint does not mention "enjoining" any action in its Complaint or collecting attorney fees.  But, as the court previously stated in this case, (*see* Entry on Defendants' Motion to Dismiss at 8 – 9), the ESA explicitly contemplates injunctive relief and disclaims limiting any right that otherwise exists under statute or common law.  16 U.S.C. § 1540(g)(5).  Courts have understood this as broad grant of authority to fashion equitable remedies.  *See Kuehl*, 887 F.3d at 854 – 55; *see also id.* at 856 (Goldberg, J. concurring) (noting district courts have broad remedial powers under the ESA).  As for fees, the ESA grants discretion to the court to award fees.  16 U.S.C. § 1540(g)(4).  Stark's motion is therefore **DENIED**.

### D.    PETA is Entitled to a Permanent Injunction

A permanent injunction should only be awarded when the plaintiff has shown (1) success on the merits, (2) irreparable harm, (3) the benefits of granting an injunction outweigh the harm caused to the defendant, and (4) an injunction favors the public interest.  *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003).  PETA has succeeded on the merits, and the court stands by its previous position with respect to the other criteria.  *Wildlife in Need, Inc.*, 2018 WL 828461, at *7 – 8.  The court therefore grants PETA's request for a permanent injunction.

## III.    Conclusion

For the reasons above, PETA's Motion for Partial Summary Judgment (Filing No. 315) is **GRANTED**. An order accompanying this Entry will spell out the details of the injunction. PETA's request for a hearing to consider the appointment of a special master or guardian ad litem to identify a reputable sanctuary is **DENIED**. Within 30 days, PETA shall file a motion (with appropriate evidence) to appoint a special master and identify a reputable wildlife sanctuary. The WIN Defendants can respond accordingly. PETA's request for attorneys' fees and costs is **DENIED WITHOUT PREJUDICE**. PETA can file a motion for such expenses when there is a final judgment entered in this case, and the court will consider it then. PETA's Motion to Strike (Filing No. 367) is **DENIED as MOOT**. Stark's Motion for Partial Summary Judgment (Filing No. 289) is **DENIED**.

**SO ORDERED** this 3rd day of August 2020.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.

Mail to:

**TIMOTHY L. STARK**
3320 Jack Teeple Road
Charlestown, IN 47111
PRO SE

32

**JEFFREY L. LOWE**
25803 North County Road 3250
Wynnewood, OK 73098
PRO SE